**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| METALLICA, a California general partnership, | Case No. 23-cv-15181 |
| Plaintiff, | |
| v. | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", | |
| Defendants. | |

**COMPLAINT**

Plaintiff Metallica, a California general partnership ("Plaintiff" or "Metallica") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

**I. JURISDICTION AND VENUE**

1.     This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities so as to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases").  Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer

shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell products using infringing and counterfeit versions of Plaintiff's federally registered trademarks (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the state of Illinois.

## II. INTRODUCTION

3.      Plaintiff filed this case to prevent e-commerce store operators who trade upon Plaintiff's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Plaintiff's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect consumers from purchasing Unauthorized Products over the Internet. Plaintiff has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks because of Defendants' actions and therefore seeks injunctive and monetary relief.

### III. THE PARTIES

4.      Plaintiff, Metallica, is a California general partnership having its principal place of business in California and is the owner of the trademark rights asserted in this action.

5.      Plaintiff is a recording, licensing, and publishing company owned by the members of Metallica, the long recognized and acclaimed American heavy-metal band.  Metallica, one of the biggest selling acts in American history, was formed in 1981 by vocalist/guitarist James Hetfield and drummer Lars Ulrich, and currently includes guitarist Kirk Hammett and bassist Robert Trujillo.  The band has released a multitude of albums, including famous albums *Metallica* and *Master of Puppets*, that have sold over 125 million copies worldwide.  Metallica also has a new album, *72 Seasons*, set for release in April 2023.

6.      Due to its massive success, Metallica has conducted several world tours spanning across the globe, including a 2013 performance in Antarctica that cemented Metallica as the first band to ever play on all seven continents.  Metallica has also won countless awards, including (1) numerous Grammys across the categories of Best Metal Performance, Best Rock Instrumental Performance, and Best Recording Package; (2) two American Music Awards for Favorite Heavy Metal/Hard Rock Artist; (3) five Billboard Music Awards, including one for Top Rock Album for the album *Hardwired...To Self-Destruct*, (4) iHeartRadio Music Awards for Rock Album and Rock Artist of the Year, and (5) seven British Kerrang! Awards, including Best Band on the Planet in 2004.  Metallica's international recognition culminated in their induction into the American Rock and Roll Hall of Fame in 2009.  With tour dates already set for 2023 and 2024, Metallica's impact on music and culture continues to be a dominating force in rock markets around the globe.

7.      With a strong fan-base, Plaintiff markets and sells a variety of Metallica-branded products, including clothing, posters, bags, stickers, banners, beverage ware, and other merchandise bearing Plaintiff's trademarks (collectively, "Plaintiff's Products"). Plaintiff's Products have become enormously popular and even iconic, driven by Plaintiff's quality standards and innovative designs. Among the purchasing public, Plaintiff's Products are instantly recognizable as such. Plaintiff's Products are distributed and sold to consumers by Plaintiff and its licensees through authorized retailers throughout the United States and through Plaintiff's website, www.metallica.com.

8.      Plaintiff has used the METALLICA trademark, and other trademarks, for many years and has continuously sold products under its trademarks ("Plaintiff's Trademarks"). As a result of this long-standing use, strong common law trademark rights have amassed in Plaintiff's Trademarks. Plaintiff's use of the marks has also built substantial goodwill in Plaintiff's Trademarks. Plaintiff's Trademarks are famous marks and valuable assets of Plaintiff. Plaintiff's Products also typically include at least one of Plaintiff's Trademarks.

9.      Plaintiff's Trademarks are registered with the United States Patent and Trademark Office and are included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 1,819,042 | METALLICA | Feb. 01, 1994 | For: clothing; namely, T-shirts, shorts, hats, and scarves in class 025. |
| 1,840,372 | METALLICA | Jun. 21, 1994 | For: prerecorded video and audio cassette tapes featuring musical performances and phonograph records featuring musical performances in class 009. |
| 1,842,920 | METALLICA | Jul. 05, 1994 | For: posters, tour books relating to musical performances, concert |

| | | | |
|---|---|---|---|
| | | | programs, stickers and decals in class 016. |
| 2,260,705 | METALLICA | Jul. 13, 1999 | For: backpacks, handbags, and wallets in class 018. |
| 2,504,291 | METALLICA | Nov. 06, 2001 | For: clothing, namely, shirts, sweatpants, hockey jerseys, soccer jerseys, sweatshirts, basketball jerseys, long-sleeve t-shirts, tank tops, jackets, baseball jerseys, baby doll t-shirts, polo shirts, muscle t-shirts, baby rompers, toddler t-shirts, allovers, and hooded shirts in class 025. |
| 2,712,922 | METALLICA | May 06, 2003 | For: non-metal key chains; furniture in class 020. |
| 2,781,225 | METALLICA | Nov. 11, 2003 | For: floor mats for vehicles and SUV mats in class 027. |
| 2,804,625 | METALLICA | Jan. 13, 2004 | For: Jewelry in class 014. |
| 2,841,402 | METALLICA | May 11, 2004 | For: action figures and accessories therefor in class 028. |
| 3,261,375 | METALLICA | Jul. 10, 2007 | For: Christmas tree ornaments in class 028. |
| 3,741,986 | METALLICA | Jan. 26, 2010 | For: Ornamental novelty buttons; ornamental novelty cloth patches for clothing; ornamental novelty embroidered patches for clothing in class 026. |
| 3,823,734 | METALLICA | Jul. 27, 2010 | For: beverageware; barware, namely, beverage glassware and drinking glasses and shot glasses; beverage coolers, namely, foam drink holders and insulating sleeve holders for beverage cans; flasks; bottle openers; and coasters not of paper and not being table linen in class 021. |

| | | | |
|---|---|---|---|
| 3,982,410 | METALLICA | Jun. 21, 2011 | For: magnets; video games; downloadable ring tones, music; and downloadable audio files in the field of music in class 009. |
| 4,859,494 | METALLICA | Nov. 24, 2015 | For: Board games; beach balls; puzzles; flying discs; hockey pucks; playing cards; coin and non-coin operated pinball machines; and bobblehead dolls in class 028. |
| 2,198,824 |  | Oct. 20, 1998 | For: stickers, decals in class 016. |
| 3,666,335 |  | Aug. 11, 2009 | For: Musical sound recordings; musical video and audio recordings in class 009. |
| 2,155,490 |  | May 05, 1998 | For: stickers, decals in class 016. |

| 2,160,868 |  | May 26, 1998 | For: clothing, namely, T-shirts, shirts, hats, baseball caps in class 025. |
| 3,666,336 |  | Aug. 11, 2009 | For: Musical sound recordings; musical video and audio recordings in class 009. |
| 2,231,065 |  | Mar. 09, 1999 | For: clothing, namely, T-shirts, shirts in class 025. |
| 3,275,658 |  | Aug. 07, 2007 | For: song books in class 016. |
| 3,275,659 |  | Aug. 07, 2007 | For: clothing, namely, t-shirts, sweatshirts in class 025. |

| 3,352,792 |  | Dec. 11, 2007 | For: Musical sound recordings; pre-recorded compact discs, DVDs, and audio/visual discs, all featuring music in class 009. |
|---|---|---|---|
| 3,952,320 |  | Apr. 26, 2011 | For: Clothing, namely, t-shirts, jackets and headwear in class 025. |
| 4,035,348 |  | Oct. 04, 2011 | For: Clothing, namely, sweatshirts in class 025. |
| 4,035,349 |  | Oct. 04, 2011 | For: Clothing, namely, sweatshirts in class 025. |
| 1,923,477 |  | Oct. 03, 1995 | For: series of pre-recorded video and audio cassettes, and a series of pre-recorded phonograph records and compact discs featuring musical performances in class 009. |
| 2,213,592 |  | Dec. 29, 1998 | For: clothing, namely, T-shirts, hooded shirts, crew shirts, ponchos, headwear, and baseball caps in class 025. |

| 7,163,896 | METALLICA | Sep. 12, 2023 | For: All-purpose carrying bags; Backpacks; Handbags; Wallets in class |
|---|---|---|---|
| 5,452,866 | METALLICA | Apr. 24, 2018 | For: Guitar picks; drum sticks in class 015. |
| 5,452,867 | METALLICA | Apr. 24, 2018 | For: Bandanas; cloth bibs; dresses; infantwear; jackets; jerseys; leggings; pants; shirts; shorts; sweaters; sweatpants; sweatshirts; tank tops; thermal shirts; t-shirts; tunics; vests; gloves; headwear in class 025. |
| 5,573,362 | METALLICA | Oct. 02, 2018 | For: Art books; art prints; blank journals; books in the field of entertainment; calendars; decals; gift wrap paper; magazines in the field of entertainment; non-magnetically encoded gift cards; posters; protective covers for paper, magazines and the like; printed sheet music; songbooks; stencils; stickers in class 016. |
| 5,718,939 | METALLICA | Apr. 09, 2019 | For: Audio and video recordings featuring music and musical performances; decorative magnets; downloadable mobile applications featuring information and content relating to music and entertainment; downloadable musical sound recordings; downloadable musical video recordings; downloadable photographs; downloadable ring tones and graphics for mobile phones and computers; DVDs featuring music documentaries; |

| | | | |
|---|---|---|---|
| | | | DVDs and CDs featuring sheet music, songbooks, and music instruction; electronic publications, namely, magazines featuring entertainment-related content downloadable via the internet and mobile devices; phone cases; slipmats for record player turntables; box sets consisting primarily of prerecorded DVDs, CDs, and phonograph records, and also including books, photographs, lyric sheets, posters, lithographs, buttons, and patches, all featuring or relating to music in class 009.<br><br>For: Gift card transaction processing services; financial services, namely, issuing electronic stored value gift cards for the purchase of goods electronically via the internet and mobile phone; virtual gift card services, namely, issuance of electronic gift cards that can be redeemed for goods at participating retailers in class 036. |
| 4,602,816 | BLACKENED | Sep. 09, 2014 | For: Audio-visual recordings featuring music; musical sound recordings; musical video recordings in class 009. |
| 4,902,183 | BLACKENED | Feb. 16, 2016 | For: Downloadable music via the Internet and mobile devices in class 009. |
| 4,782,311 | BLACKENED RECORDINGS | Jul. 28, 2015 | For: Audio-visual recordings featuring music; downloadable music via the Internet and mobile devices; downloadable video recordings featuring music; musical sound recordings; musical video recordings in class 009. |

| 4,576,954 | HIT 'EM ALL | Jul. 29, 2014 | For: Clothing, namely, sweatshirts, and t-shirts in class 025. |
| 5,715,840 | FIFTH MEMBER | Apr. 02, 2019 | For: metal key rings; metal key chains in class 006. |
| 5,800,646 | FIFTH MEMBER | Jul. 09, 2019 | For: Blank journals; decals; stencils; stickers in class 016. |
| 5,800,647 | FIFTH MEMBER | Jul. 09, 2019 | For: Clothing, namely, bandanas, infantwear, jackets, shirts, sweatshirts, tank tops, t-shirts, wind resistant jackets; baby bibs not of paper; headwear in class 025. |
| 5,835,081 | FIFTH MEMBER | Aug. 13, 2019 | For: Belt buckles; ornamental patches for clothing; hair accessories, namely, hair bands; hair clips; ornamental novelty buttons; shoe laces in class 026. |
| 5,839,992 | FIFTH MEMBER | Aug. 20, 2019 | For: beverage ware; bottle openers; water bottles sold empty in class 021. |

10.     The U.S. registrations for Plaintiff's Trademarks are valid, subsisting, and in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065. The registrations for Plaintiff's Trademarks constitute *prima facie* evidence of their validity and of Plaintiff's exclusive right to use Plaintiff's Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the United States Registration Certificates for Plaintiff's Trademarks are attached hereto as **Exhibit 1**.

11.     Plaintiff's Trademarks are exclusive to Plaintiff and are displayed extensively on Plaintiff's Products and in marketing and promotional materials. Plaintiff's Trademarks are also distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff, or its licensees, and are manufactured to Plaintiff's quality standards. Whether

Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that products bearing Plaintiff's Trademarks are manufactured to the highest quality standards.

12.     Plaintiff's Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been continuously used and never abandoned. The success of Metallica, in addition to the marketing of Plaintiff's Products, has enabled the Metallica brand to achieve widespread recognition and fame and has made Plaintiff's Trademarks some of the most well-known marks in the music industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Metallica brand have made Plaintiff's Trademarks valuable assets of Plaintiff.

13.     Products bearing Plaintiff's Trademarks have been the subject of substantial and continuous marketing and promotion. Plaintiff has marketed and promoted, and continues to market and promote, Plaintiff's Trademarks in the industry and to consumers through traditional print media, authorized retailers, social media sites, point of sale material, and its website, www.metallica.com.

14.     Plaintiff has expended substantial time, money, and other resources advertising, promoting, and marketing Plaintiff's Products. Plaintiff's Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the Metallica brand. As a result, products bearing Plaintiff's Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Plaintiff.  Plaintiff's Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with Plaintiff's Trademarks is of immeasurable value to Plaintiff.

15.     Plaintiff's Products are sold only by Plaintiff or through authorized licensees and are recognized by the public as being exclusively associated with the Metallica brand.

16.     Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff.  On information and belief, Defendants reside and/or operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations.  Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

17.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto.  Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

18.     The success of the Metallica brand has resulted in significant counterfeiting of Plaintiff's Trademarks.  Because of this, Plaintiff has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Plaintiff has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms like Alibaba Group Holding Ltd. ("Alibaba"), AliExpress.com ("AliExpress"), Amazon.com, Inc. ("Amazon"), eBay, Inc. ("eBay"), ecrater.com ("eCRATER"), Etsy, Inc. ("Etsy"), Pixels.com, LLC d/b/a Fine Art America ("Fine Art America") and Pixels.com ("Pixels"), Printerval.com ("Printerval"), Redbubble Limited ("Redbubble"), Spreadshirt, Inc. ("Spreadshirt"), WhaleCo, Inc. ("Temu"), Walmart, Inc. ("Walmart"), and Context Logic, Inc. d/b/a Wish.com ("Wish"), including the e-

commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

19.     Because counterfeit products sold by offshore online counterfeiters do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id.* When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods costs the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

20.     Online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least

some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts.  **Exhibit 4** at p. 22.  Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated.  **Exhibit 4** at p. 39.  Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters."  **Exhibit 3** at 186-187.  Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order."  *Id*. at p. 161.

21.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell Unauthorized Products to residents of Illinois.

22.     Defendants concurrently employ and benefit from similar advertising and marketing strategies.  For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers.  E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards, Alipay, Amazon Pay, and/or PayPal.  E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish

their stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use Plaintiff's Trademarks, and none of the Defendants are authorized retailers of Plaintiff's Products.

23.     Many Defendants also deceive unknowing consumers by using Plaintiff's Trademarks within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Plaintiff's Products. Other e-commerce stores operating under the Seller Aliases omit using Plaintiff's Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's Products.

24.     E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

25.     E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

26.     Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and

quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

27. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators, like Defendants, of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

28. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Plaintiff's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff.

29. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff have, jointly and severally, knowingly and willfully used and continue to use Plaintiff's Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

30.     Defendants' unauthorized use of Plaintiff's Trademarks in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

31.     Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

32.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of Plaintiff's Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiff's Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from products offered, sold, or marketed under Plaintiff's Trademarks.

33.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiff's Trademarks without Plaintiff's permission.

34.     Plaintiff is the owner of Plaintiff's Trademarks. Plaintiff's United States registrations for Plaintiff's Trademarks are in full force and effect. On information and belief, Defendants have knowledge of Plaintiff's rights in Plaintiff's Trademarks and are willfully infringing and intentionally using infringing and counterfeit versions of Plaintiff's Trademarks. Defendants' willful, intentional, and unauthorized use of Plaintiff's Trademarks is likely to cause,

and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

35.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

36.     Plaintiff has no adequate remedy at law and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of Plaintiff's Trademarks.

37.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

38.     Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

39.     Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Unauthorized Products by Plaintiff.

40.     By using Plaintiff's Trademarks in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

41.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

42.    Plaintiff has no adequate remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Metallica brand if Defendants' actions are not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)    That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a.   using Plaintiff's Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not one of Plaintiff's Products or is not authorized by Plaintiff to be sold in connection with Plaintiff's Trademarks;

   b.   passing off, inducing, or enabling others to sell or pass off any product as one of Plaintiff's Products or any other product produced by Plaintiff, that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under Plaintiff's Trademarks;

   c.   committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

   d.   further infringing Plaintiff's Trademarks and damaging Plaintiff's goodwill; and

      e.    manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's Trademarks;

2)     Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms, including Alibaba, AliExpress, Amazon, eBay, eCRATER, Etsy, Fine Art America and Pixels, Printerval, Redbubble, Spreadshirt, Temu, Walmart, and Wish, shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiff's Trademarks;

3)     That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiff's Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4)     In the alternative, that Plaintiff be awarded statutory damages, for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2), of $2,000,000 for each and every use of Plaintiff's Trademarks;

5)     That Plaintiff be awarded its reasonable attorneys' fees and costs; and

6)     Award any and all other relief that this Court deems just and proper.

Dated this 20th day of October 2023.     Respectfully submitted,

<u>/s/ Martin F. Trainor</u>
Martin F. Trainor
Sydney Fenton
TME Law, P.C.
10 S. Riverside Plaza
Suite 875
Chicago, Illinois 60606
708.475.1127
martin@tme-law.com
sydney@tme-law.com

*Counsel for Plaintiff Metallica*